1

2

3

4

5

6

7

8          **UNITED STATES DISTRICT COURT**

9         **SOUTHERN DISTRICT OF CALIFORNIA**

10  SECURITIES AND EXCHANGE                    CASE NO. 04CV2105 JM (AJB)
    COMMISSION,
11                                             **ORDER GRANTING IN PART AND**
                                    Plaintiff, **DENYING IN PART  PLAINTIFF'S**
12       vs.                                   **MOTION FOR SUMMARY**
                                               **JUDGMENT**
13
    PLATFORMS WIRELESS                         **[Docket No. 90]**
14  INTERNATIONAL, CORP., et. al.,

15                                 Defendants.

16          This is a Securities and Exchange Commission ("SEC") enforcement action against defendants

17  Platforms Wireless International Corp., Inc., William C. Martin, Charles C. Nelson, Robert Perry, and

18  Francois Draper (collectively the "Defendants").  The complaint alleges violations of § 5 of the

19  Securities Act of 1933, 15 U.S.C. § 77e(a), and violations of § 10(b) of the Securities and Exchange

20  Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 (collectively "Rule

21  10b-5").  The SEC now moves for summary judgment against all defendants as to the Rule 10b-5

22  violation only.[1]  Defendants oppose the motion.  The court deemed the matter suitable for decision

23  without oral argument pursuant to Local Rule 7.1.d.1.  After considering the parties' papers and

24  evidence submitted therewith, the court hereby **GRANTS IN PART** and **DENIES IN PART** the

25  motion as set forth below.

26  / / /

27

28          ---
            [1] The court has already granted the SEC's motion for partial summary judgment with respect to the §
        5 violation as against Platforms Wireless, Martin, and Draper.  See Docket No. 75.

## I.   **BACKGROUND**

Defendant Platforms Wireless International Corp., Inc. ("Platforms") is a publicly-traded wireless telecommunications company doing business in San Diego, California.  Martin, Nelson, Perry, and Draper are officers of Platforms.  The SEC alleges that in 2000-2001, Defendants issued a series of press releases containing false and misleading statements in order to influence the price of Platforms stock, in violation of Rule 10b-5.  These press releases were issued on May 15, 2000, August 23, 2000, September 19, 2000, January 16, 2001, March 5, 2001, and March 8, 2001.  The press releases touted Platforms' development of a product called the ARC System, which purportedly offered cost-efficient delivery of wireless communications services.  The press releases also projected $1 billion in sales and a $330 million contract between Platforms and a Brazilian company for the purchase of the ARC System.  The press releases further provided that Platforms was nearing completion of certain financial audits that would eventually result in Platforms being relisted on the public exchanges.

Around the time of each press release, Platforms stock was being traded at the following prices.  On May 15, 2000, Platforms' stock price increased by 20% on May 15, 2000, and then increased another 20% on May 16, 2000.  See Mot., Ex. 48 (Bloomberg data for Platforms' daily share price from May 1, 2000 to May 1, 2001).  On August 24, 2000, the stock price was at $0.28 per share, down from $0.30 on the prior day.  Id.  On September 20, 2000, the price was $0.25 per share, the same price as the previous day.  Id.  Between January 16, 2007 and January 22, 2007, Platforms' stock price more than doubled, from $0.175 per share on January 16 to $0.38 per share on January 22.  Id.  On March 6, 2001, the price fell to $0.255 from the previous day's close of $0.30.  Id.  On March 9, 2001, after the last press release at issue in this case was published, Platforms' stock was at $0.23 per share, down from the share price of $0.24 on Friday, March 9, 2001.  Id.

## II.   **LEGAL STANDARDS**

Summary judgment is properly granted when the pleadings, affidavits, and other supporting papers permitted by Federal Rule of Civil Procedure 56(c) demonstrate that there is no genuine issue of material fact such that the moving party is entitled to prevail as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the movant has made such a showing,

"the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment." Nillson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec, 854 F.2d 1538, 1542 (9th Cir. 1988). Rather, the opposing party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (internal quotations omitted). At least some "significant probative evidence" must be produced to create a genuine issue of fact for trial. Nilsson, 854 F.2d at 1542. An issue is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is appropriate when the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion. LaLonde v. County of Riverside, 204 F.3d 947, 959 (9th Cir. 2000). "If conflicting inferences may be drawn from the facts, the case must go to the jury." Id. (citing Pierce v. Multnomah County, 76 F.3d 1032, 1037 (9th Cir. 1996)).

## III.    RULE 10B-5

Section 10(b) of the Securities and Exchange Act makes it unlawful

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 in turn makes it unlawful for

> any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, . . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To establish a prima face case under § 10(b), the SEC must show that the Defendants made a misstatement or omission of a material fact with scienter. See SEC v. Fehn, 97 F.3d 1276, 1289 (9th Cir. 1996). A fact is material if "there is a reasonable likelihood that a reasonable shareholder would

consider it important" in making an investment decision. TSC Indus., Inc. v. Northway, Inc., 426 U.S.

438, 449 (1976); Zweig v. Hearst Corp., 595 F.2d 1261, 1266 (9th Cir. 1979).  Scienter is "a mental

state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185,

193 n.12 (1976).  Scienter is established upon proof that the defendant acted knowingly or recklessly.

Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th Cir. 1990) (en banc).  Conduct is

reckless if it leads to

> a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

Id. at 1569 (adopting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977))

(internal quotations omitted).  The scienter of a corporation can be imputed from that of its officers.

SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

With these standards in mind, the court now addresses each press release in turn.

**IV.**   **May 15, 2000 Press Release**

**A**.  **Falsity and Materiality**

***Statement that contract was worth $330 million.***  In the May 15, 2000 press release, Platforms

announced "that two years of intensive marketing efforts in Brazil have culminated in a landmark,

$330 million contract award from AMERICEL S.A. . . . one of the leading cellular communications

service providers in Brazil[.]"  Mot., Ex. 13.  The release further provided that the contract was

"conditional on the performance by Platforms of a successful ARC System BETA Demonstration in

Brazil in the 4th Quarter of 2000, [and] is for a ten-year lease of up to five (5) ARC Systems."  Id.

As the SEC points out, however, the contract between Platforms and Americel was not valued

at $330 million but rather for an undetermined price to be negotiated in the future based on Americel's

"Most Favored Nation" status ("MFN").  Mot., Ex. 15 at art. 3 (copy of contract).  The court finds that

in light of the contract language, the statement that the contract between Platforms and Americel was

valued at $330 million was false when made, and Defendants have not come forth with any evidence

creating a genuine issue of fact to the contrary.  The statement was also material because a reasonable

1   investor, before making an investment decision, would want to know that the contract price was

2   actually to be negotiated and not $330 million.

3       Defendants argue that the MFN clause was not material as a matter of law because such

4   clauses are common in long-term contracts.  Oppo. at 8.  This argument fails to create a genuine issue

5   of fact as to whether or not the contract price was, contrary to the press release, to be determined and

6   not for fixed at $330 million.  Whether or not MFN clauses are common or not is not relevant to the

7   issue of how much the contract was worth.

8       ***Failure to mention that Americel had right to cancel.***  The SEC also contends that the press

9   release omitted a material fact by failing to mention that the contract permitted Americel to cancel at

10  its sole discretion.  Mot., Ex. 15 art. 11.  In response, Defendants argue that "[t]hroughout the

11  negotiation of the agreement, Platforms received continued assurances that the cancellation provision

12  would not be utilized, and that it was required by Brazilian law."  Oppo. at 9.

13      On the current record, the court cannot conclude that the omission was material as a matter of

14  law.  Draper testified that "it was [the] clear understanding that if [Platforms] met the requirements of

15  the contract, [Americel] had the commitment to proceed", the cancellation clause notwithstanding.

16  Defs. Ex. 1 at 70.  If credited, a jury could conclude that the cancellation provision was not operative

17  and therefore the failure to mention it in the press release was immaterial.[2]

18  **B. <u>Scienter</u>**

19      ***Statement that contract was valued at $330 million.***  Defendant Martin is Platforms' Chief

20  Executive Officer.  Martin Decl., ¶ 2.  In the May 15, 2000 press release, he is quoted as stating "The

21  award of this [$330 million] contract by AMERICEL, one of the leading cellular communications

22  service providers in Brazil, is a resounding validation of our airborne wireless communications

23  technology in one of the most competitive telecommunications markets in the world."  Mot, Ex. 13.

24  The court finds that Martin's conduct was reckless as a matter of law in light of the contract expressly

25  providing that the contract price was to be negotiated.  Draper admitted in his deposition that "the

26  impression I was left with is that the [May 15, 2000] p.r. had been released in order to make the price

27  _____

28      [2] In addition, the press release states that the contract is conditioned on a successful beta test by
    Platforms.  On this basis a jury could conclude that failure to mention the cancellation provision was immaterial
    since the press release already gives the impression that the contract is somewhat contingent.

1    of the stock go up, and it didn't matter what the consequences were, meaning it didn't matter who got

2    upset for what." Mot., Ex. 2 at 245-46. Draper also wrote in an internal company email dated July 7,

3    2000 that

> After the niceties and cordialities, during the first 10 minutes of the meeting, I thought
> it was over – I really thought we had lost Americel. Man, was he pissed at us. The
> Press Release did not reflect the reality of the contract . . . you lacked judgement in the
> Presss [sic] Release . . . [t]he inuendos [sic] created by NOT releasing the 'truth' in the
> PR were incredible. The titled should have read something like 'Americel and PIC
> join in a Beta Test'. It may not have been sexy but it was the truth.

8    Mot., Ex. 17. In his deposition, Draper confirmed that announcing a beta test, and not a deal valued

9    at $330 million, "would have probably have better reflected the truth." Defs. Ex. 1 at 69. Defendants

10   have failed to point to any probative evidence that Draper did not know the statement was false or was

11   not otherwise reckless. Therefore, the court finds the materially false statement regarding the alleged

12   $330 million contract was made with scienter as a matter of law.

13            ***Failure to mention that Americel had right to cancel.*** Since the court finds that Defendants

14   have created a genuine issue of fact as to whether this omission is materially misleading, the court

15   need not address whether the omission was made with scienter.

16            Accordingly, the court grants the motion with respect to the May 15, 2000 release on the basis

17   of the $330 million contract statement only.

18   **V.   August 23, 2000 Press Release**

19       **A. Falsity and Materiality**

20            In this press release, Platforms announced "its new family of Airborne 'Zerogravity

21   AeroStructures'" which offers "a superior, proven, more stable, and far more efficient and cost-

22   effective Airborne infrastructure platform than fixed-wing aircraft." Mot., Ex. 23 at 1. The press

23   release went on to describe the product as "a large, unmanned, helium-filled, aerodynamically-shaped

24   airship structure that can be stationed at an altitude of up to 25,000 feet." Id. Martin is quoted in the

25   press release as being "pleased to announce negotiations and program logistics for the implementation

26   and deployment of our new family of airborne wireless communications infrastructures have been

27   completed." Id. at 1-2. Perry is quoted as describing the technological advances of the ARC System.

28   Id. at 2, 7.

1   The SEC argues that no genuine issue of fact exists as to whether this press release contained

2   misstatements of material fact because the press release gives the false impression that Platforms had

3   a commercially-viable product that was ready for market.   These impressions are false, according to

4   the SEC, because the evidence only permits the conclusion that at the time of the press release,

5   Platforms did not have an ARC System but only "the description and definition of how the system

6   would operate." Mot., Ex. 3 at 224 (Martin deposition).   Additionally, Platforms' bank statement on

7   August 31, 2000 reflects a balance of only $16,530, which was not enough to purchase the

8   "aerodynamically-shaped airship structure" touted in the press release. Id., Ex. 24 at SEC V PLFM-

9   00038898 (bank statement); see also id., Ex. 3 at 285-86 (Martin deposition testimony that around

10  June-July 2000, Platforms did not have the $50,000 needed to purchase the airship in connection with

11  the products announced in the August 23, 2000 press release).   In response, Defendants contend that

12  the press release is not materially misleading because it merely announces that Platforms "had secured

13  the ability to deploy its telecommunications system in an aerostat manufactured by a leading

14  manufacturer of those systems" and not that it had actually deployed such a system.   Oppo. at 11.

15  The court agrees with the SEC.  Read as a whole, the press release only permits the conclusion

16  that Platforms was announcing it had actually developed a viable ARC System.   The press release is

17  nine pages long, in relatively small type, and single spaced.   It describes the physical characteristics

18  and functionality of the system in great detail, taking up the first two pages and the last three and one-

19  half pages.   See, e.g., Mot, Ex. 23 at 6 ("ARC System Zer0Gravity AeroStructures provide

20  uninterrupted wireless communications service coverage, approximately 80% to 90% of the time, or

21  better, depending on longitudinal and latitudinal geographic position . . . and are designed to operate

22  at an altitude of 15,000 to 25,000 feet, tethered to a mooring station, providing wireless

23  communications service coverage to a diameter area ranging from 60 to 1,100 Km., with a service

24  capacity ranging from 50,000 to 1,500,000 subscribers."). The evidence cited by the SEC above could

25  only lead to the conclusion that this detailed announcement was misleading since Platforms only had

26  a drawings and descriptions of the system and no funds to purchase the requisite airship.   Moreover,

27  Defendants have not come forth with any evidence that would allow a jury to find otherwise.

28  Therefore, the court finds this press release, as a whole, is materially misleading as a matter of law.

**B.     Scienter**

Martin admitted that there was no actual ARC System in existence at the time, only a description of the system.  Mot., Ex. 3 at 224.   Therefore, Martin and Platforms acted with scienter because he knew or was reckless in not knowing that the press release would give the false impression that the ARC System was ready for market.

Perry, however, testified that he did not make the statements attributed to him and that he does not remember this press release or being asked to comment on it.  Defs. Ex. 2 at 127-27.  If true, Perry's conduct could nevertheless represent an extreme departure from ordinary care, since officers of publicly-traded companies can be reasonably expected to manage public dissemination of their statements.  Nevertheless, the court finds that this determination of whether Perry acted recklessly is more appropriately deferred to the jury.  Therefore, the court cannot conclude that Perry acted with scienter as a matter of law with regard to this particular press release.

In sum, as to the August 23, 2000 press release, the court grants the motion with regard to Platforms and Martin and denies the motion as to Perry.

**VI.     September 19, 2000 Press Release**

**A. Falsity and Materiality**

This press release announced that Platforms would reach "$1 billion in ARC System contracts by the end of FYE June 30, 2001."  Mot, Ex. 33 at 5-6.  The court finds that this statement is material as a matter of law because it cannot be reasonably disputed that whether or not Platforms had a viable opportunity to realize $1 billion in revenue would be important to a reasonable investor's decision to invest.

As to falsity, the SEC contends that the $1 billion projection is false as a matter of law because Platforms had no ARC system at the time, only "the description and definition of how the system would operate."  Mot., Ex. 3 at 224 (Martin deposition).  The SEC also points to evidence showing that Platforms had only $28,046 in its bank account on September 29, 2000, just after the announcement of the $1 billion forecast.  Id., Ex. 24; cf. id., Ex. 34 (bank notice showing that Platforms bounced a check for $13,218 dated September 15, 2000).  Finally, the SEC argues that Martin admitted in his deposition that the $1 billion sales projection was "a naive statement" that was

issued "to my own chagrin and regret, because I believed what people were telling me and at the time I was simply not experienced enough to discern what was credible or not." Mot., Ex. 8 at 292;[3] <u>Marx v. Computer Sciences Corp.</u>, 507 F.2d 485, 490 (9th Cir. 1974) (providing that a forecast is an untrue statement under Rule 10b-5 if it was made without reasonable preparation or a valid basis).

Defendants have not come forward with any probative evidence that would allow a jury to conclude the forecast is not untrue under the <u>Marx</u> standard.  Therefore, on the basis of the evidence cited by the SEC, the court finds that the forecast is materially false as a matter of law because, as demonstrated by Martin's admission, it was made without reasonable preparation or a valid basis.[4]

The SEC also contends that the September 19, 2000 statement that "[a]udited financial statements for FYE June 30, 2000 are expected to be completed in October, bringing Platforms completely up to date on all of its accounting functions" was materially false as a matter of law because those audited financial statements were not actually released until nineteen months later.  Pl. SOF ¶ 29; Mot., Ex. 49.  The mere fact of the delay alone, however, does not mean a rational trier of fact could only conclude that Defendants' statement of expectation–that the audited financial statements would be completed in October 2000–was false when made.  Therefore, summary judgment is inappropriate with respect to the statement regarding the imminent release of Platforms' financial statements.

**B.   Scienter**

Martin's declaration provides that his forecast was based on certain negotiations with countries in Asia, and that the $1 billion forecast was overly optimistic.  Martin Decl. ¶ 19.  The declaration goes on to provide

---

[3] Defendants' argument that Martin's deposition statement that "he owns up to" the naivete of the $1 billion forecast, Mot., Ex. 3 at 293, is merely one of responsibility and not culpability, is completely devoid of merit.  Oppo. at 13:15.  The court cannot discern any material difference between responsibility and culpability under the circumstances of this case.  Furthermore, the argument is contradicted by the very next sentence in Defendants' opposition papers, which provides "Martin was merely stating that the mistake was committed by him, and not by someone else."  <u>Id.</u> at 13:16-17.

[4] Defendants argue that the $1 billion forecast is protected as a forward-looking statement under Rule 175 of the Securities Act of 1933 and Rule 3b-6 of the Securities Exchange Act of 1934, as defined in the Private Securities Litigation Reform Act of 1995.  Defs. SOF ¶ 36.  Putting aside whether Rule 175 or Rule 3b-6 applies here, those rules only protect forward-looking statements made in filings to the SEC or annual reports to shareholders, not in press releases.  <u>See</u> 17 C.F.R. §§ 230.175(b)(1), 240.3b-6(b)(1).  Therefore, the argument lacks merit.

1

2
Now, after years of working with the emerging and developing nations of the world, I realize just how inexperienced and naive I was about the nature and pitfalls of third world business and contractual representations.  The marketing projection in question, albeit made in good faith and inexperienced belief in the international market opportunities before the Company at the time, was my mistake and I regret having made it.  A lesson well learned.

3

4

5   Martin Decl. ¶ 19.   The court finds that this constitutes an admission of recklessness and therefore

6   the scienter element is established as a matter of law with respect to the $1 billion forecast.  Martin's

7   admission only permits the conclusion that his conduct was an extreme departure from the ordinary

8   standard of care, and Martin has not set forth any probative evidence to the contrary.  Additionally,

9   the danger of misleading investors, who would likely give credence to a company-issued $1 billion

10  forecast, should have been obvious to Martin, the CEO of a publicly-traded company.  Martin's good-

11  faith belief is not enough to create a genuine issue of fact as to whether he was reckless, since

12  recklessness is judged by an objective standard.

13         For the foregoing reasons, the court grants the motion as to the September 19, 2000 press

14  release on the basis of the $1 billion forecast only.

15  **VII.    <u>January 16, 2001 Press Release</u>[5]**

16         **A. Falsity and Materiality**

17         The January 16, 2001 press release offered a detailed time line, spanning January-June 2001,

18  for the demonstration of the ARC System in Brazil.  Draper is quoted as stating "The ARC System

19  has now been elevated to an important priority at AMERICEL."  Mot., Ex. 40.  The SEC contends this

20  release is materially false and misleading because the evidence leads to the sole conclusion that the

21  time line was not feasible and "this press release perpetuated the fraudulent contention that Platforms

22  had a multi-million dollar contract with Americel and that the demonstration in Brazil would take

23  place."  Mot. at 10.  In support, the SEC points to evidence showing that as of January 31, 2001,

24  Platforms had only $46,312 in its bank account.  Mot., Ex. 24 at SEC V PLFM-00039883.  The SEC

25  also points to Nelson's deposition, during which he testified that Platforms did not have the resources

26  _____

27         [5] The SEC also contends that a January 3, 2001 press release, which is a precursor to the January 16, 2001 press release relative to the time line for demonstration in Brazil, is also materially false and misleading. Pl. SOF ¶ 33.  Because the SEC identifies the January 3, 2001 and January 16, 2001 press releases as materially false and misleading for essentially the same reasons, the court will only address the January 16, 2001 press release.

28

1  to execute the time line represented. Id., Ex. 4 at 490-494. Finally, the SEC points to an email

2  written by Victor Ziller, a Vice President to Platforms and former defendant in this action who has

3  since settled with the SEC, who stated that he had serious doubts as to Platforms' ability to meet the

4  time line. Id., Ex 41 at 2. Ziller also testified to the same in his deposition. Id., Ex. 10 at 100 ("I

5  wasn't comfortable with the dates, with the time frame that was proposed, for a series of reasons[.]").

6       In response, Defendant contends that Ziller's opinion alone is not enough to establish that the

7  January 16, 2001 release is materially misleading as a matter of law, especially since, in response to

8  Ziller's email, Draper and Martin expressed confidence that any difficulties faced by the time line

9  were surmountable. Id., Ex. 41 at 1-2. Draper also testified under oath that he subjectively believed

10  the time line could be met and that Americel had in fact prioritized the ARC system project. Defs. Ex.

11  1 at 170-71.

12       In light of the fact that Platforms clearly lacked resources to meet the time line and Ziller's

13  statements, the court finds that this press release was materially misleading as a matter of law.

14  Although some of the individual defendants may have subjectively believed that the time line events

15  could be met, this is not probative evidence that would create a genuine issue of fact on falsity and

16  materiality.

17       **B.**     **Scienter**

18       Although it is a close question, the court is unable to conclude that scienter is established as

19  a matter of law. The SEC argues that Draper's statement that "[t]he ARC System has now been

20  elevated to an important priority at Americel" is evidence of scienter, but this is not plainly apparent.

21  Mot. at 16. Although this statement gives the impression that business with Americel was moving

22  forward, it is somewhat vague as to what "an important priority" means. A rational trier of fact could

23  therefore conclude that Draper was not reckless in making such a statement since the statement could

24  be construed as a reference to ongoing talks with Americel and not to any specific, definite agreement

25  that had been reached. Furthermore, although Defendants may have been reckless in issuing the

26  pertinent time line when Platforms' resources were scarce, the court finds this determination is a fact-

27  intensive one more appropriately left to the jury. Ziller may have believed the time line was

28  unrealistic, but there is evidence showing that this belief was not also held by Draper and Martin.

1    Construing this evidence in the light most favorable to Defendants, a jury could therefore find that

2    Draper and Martin did not have the requisite intent to deceive or were not otherwise reckless.  On the

3    current record, the court is therefore unable to grant summary judgment as to the  January 16, 2001

4    press release.

5    **VIII.   March 5, 2001 Press Release**

6             **A.    Falsity and Materiality**

7         In this press release, Platforms announced a March 5, 2001 demonstration of its ARC System

8    in San Diego, during which the system was represented as floating three miles above ground.  Mot.,

9    Ex. 45.  The release further announced that the demonstration "proved that the ARC System payload

10   is fully capable of handling up to 500,000 cellular subscribers . . . making the ARC System ready for

11   worldwide deployment."  Id.

12        The court finds that these statements are materially false and misleading as a matter of law.

13   The evidence only allows the conclusion that nothing floated above the ground during the

14   demonstration, a conclusion which is not disputed by Defendants. Id., Ex. 3 at 405 (Martin deposition

15   providing "Q.  Okay.  Was there an aerostat– A. No.  Q. –at the – "A. No, there was not.  Q. – so

16   nothing was flying.  Is that right?  A.  Nothing was in the air, no."), Ex. 6 at 77-78 (Bonebright

17   deposition providing "Q.  So there was no balloon floating three miles above the ground?  A.  No.").

18   Nor were any telephone calls placed during the demonstration, which contradicts the press release's

19   assertion that the system was proven capable of handling 500,000 subscribers.  See Mot., Ex. 6 at 78

20   (Bonebright deposition providing "Q.  What during that demonstration proved that the ARC system

21   could support up to 500,000 cellular subscribers?  A.  I don't think we – the demonstration didn't

22   attempt to prove that.  It wasn't part of the demonstration we were proposing or executing.").

23        Moreover, Defendants have failed to come forth with any evidence that would create a genuine

24   issue of fact as to whether the March 5, 2001 press release was misleading.  Instead, Defendants argue

25   that the press release does not state that anything was floating above ground.  This argument misreads

26   the press release, which plainly states "Floating Three Miles Above Ground . . ." before going on to

27   detail the purported results of the demonstration.  Mot., Ex. 45.  Defendants also argue that the actual

28   purpose of the demonstration was to test "the ARC System's reception and transmission quality" and

not whether the system could float.  However, Defendants point to no evidence that would support this argument and therefore it fails.  The argument also flies in the face of the press release itself, which specifically discusses the above-ground testing and the system's proven capability to handle large numbers of subscribers.

**B.    Scienter**

Although the court concludes that the March 5, 2001 press release contained materially false and misleading statements as a matter of law, it cannot make the same conclusion with regard to scienter.  Defendants have set forth evidence that none of the Defendants authorized the issuance of the March 5, 2001 release.  Martin testified that "[t]his is not a press release.  We did not authorize it and as a result of this press release it led to the termination of the gentleman who put it out."  Defs. Ex. 4 at 313.  Martin's testimony, if credited, would permit a jury to conclude that the press release was not issued at the direction of Defendants.  This conclusion would be bolstered by the March 8, 2001 release, which also described the demonstration but in less ornate language, coming on the heels of the March 5, 2001 release.  A rational trier of fact could conclude that by releasing the subsequent release, Defendants were attempting to correct the earlier statements which had been made without their authorization.  Although issuance of an unauthorized press release could be considered reckless, the court finds this is a question more properly deferred to the jury.

Accordingly, summary judgment is denied as to the March 5, 2001 release.

**IX.    March 8, 2001 Press Release**

**A. Falsity and Materiality**

This press release further discussed the March 5, 2001 ARC System demonstration in San Diego.  Mot., Ex. 46.  Entitled "Innovative Wireless Communications Technology Successfully Demonstrated", the release quoted Draper as stating "The system you see here . . . is the same ARC System we're shipping to Brazil for commercial installation and demonstration this spring.  This System is ready to go into commercial service in the state of Goias[.]"  Id. at 3.  The press release also provided that "[t]he ARC System delivers its telecommunications services from a 150 foot long aerostat floating in restricted airspace at 15,000 feet[.]"  Id. at 1.  Finally, Perry is quoted as stating / / /

- 13 -

1 "The ARC System's airborne wireless communications capabilities are fully operational and ready

2 for commercial delivery." Id. at 3.

3     **Statement that system delivers services while floating.**  As stated earlier, the evidence only

4 permits the conclusion that nothing floated in space at the demonstration.  However, unlike the March

5 5, 2001 press release, a rational trier of fact could conclude that the March 8, 2001 press release,

6 drawing all inferences in favor of Defendants, does not state that the ARC System floated above

7 ground during the demonstration.  Although the release provides that the "ARC System delivers its

8 telecommunications services from a 150 foot long aerostat floating in restricted airspace at 15,000

9 feet," id. at 1, a jury could find, as Defendants argue, that this language, given the entirety of the press

10 release, merely describes the system's capability and not what actually took place during the

11 demonstration.  Therefore, summary judgment with regard to the statement regarding flotation above

12 ground is denied and the court need not address the scienter element as to this particular statement.

13     **Statement that system is being shipped to Brazil.**  The SEC also contends that the statement

14 regarding the ARC System being shipped to Brazil "for commercial installation and demonstration

15 this spring" is false and misleading as a matter of law because the evidence only supports the

16 conclusion that the system was, at the time, disassembled in storage and therefore could not have been

17 imminently shipped.  Draper, however, testified that although the system was disassembled, "we

18 probably would have shipped it that way.  We had discussed that how will we get it to Brazil because

19 it was just way too cumbersome."  Mot., Ex. 7 at 243; see also id., Ex. 54 at SEC V PLFM-00012066

20 (email dated May 21, 2001 from Wayne Chancellor to Draper providing "We are storing the hardware

21 in a disassembled state until the current contractual issues are resolved and we have a better

22 understanding of what the future holds.").  Construing the evidence in the light most favorable to

23 Defendants, Draper's testimony would permit the reasonable conclusion that the ARC System was

24 in fact ready to be shipped to Brazil despite its disassembled state.

25     Nevertheless, the court finds that the March 8, 2001 press release is misleading to the extent

26 it gives the impression that shipment to Brazil was underway and imminent.  Draper admitted that as

27 of May 21, 2001, the date on which Chancellor wrote an email to Draper that shipment was on hold

28 "until the current contractual issues are resolved", and that more than two months after the March 8,

2001 press release was issued, negotiations for shipment were still ongoing and yet no correction was issued. Id., Ex. 7 at 236. Defendants point to no evidence that would allow a jury to find that the statement "we're shipping [the ARC System] to Brazil for commercial installation and demonstration this spring" is not false or misleading. Finally, the statement that shipment to Brazil would soon take place is material because it gives the impression that business with Americel was moving in a positive direction, which if true would be important to a reasonable investor's decision to buy or sell Platforms stock.

**Statement that system is "fully operational and ready for commercial delivery."** Ziller testified that there was no completed airship, and therefore this statement is materially false as a matter of law. Mot, Ex. 5 at 154. Without the airship, a system described as being able to deliver wireless communications services while floating above ground is not "fully operational" or "ready for commercial delivery." Defendants have not come forth with any evidence which would permit a conclusion to the contrary. Accordingly, the court finds this statement to be materially misleading as a matter of law.

**B. Scienter**

In light of the absence of any airship, which Defendants do not dispute, the court finds that it is reckless as a matter of law for Platforms, Perry, and Draper to have made the statements they did in the March 8, 2001 release. Defendants point to no evidence creating a genuine issue of fact to the contrary. Accordingly, the court finds that reasonable people could only conclude that the March 8, 2001 contains statements that are materially misleading and that those statements were made with scienter.

To summarize, the court grants the motion with respect to the statements contained in the May 15, 2000, August 23, 2000, September 19, 2000 , and March 8, 2000 press releases as set forth above. Therefore, the court has determined that all Defendants, with the exception of Nelson, have violated Rule 10b-5 as a matter of law. The court now turns to the issue of relief.

/ / /

/ / /

/ / /

X.      **REQUESTED RELIEF**

The SEC requests a permanent injunction, disgorgement, penalties, officer and director bars, and penny stock bars.  With the exception of disgorgement, Defendants do not respond to any of the SEC arguments on relief.

A.      **Permanent Injunction**

The Commission seeks injunctive relief pursuant to § 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and § 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3). The SEC contends a permanent injunction against all Defendants in light of their individual admissions of culpability, that each stood to gain financially from the fraudulent scheme because of their Platforms stock holdings, and because the violations here took place in multiple press releases.

Permanent injunctions may be granted on summary judgment so long as there is a proper record and there exists no genuine issue of fact material to whether an injunctive relief is proper.  SEC v. Murphy, 626 F.2d 633, 654-55 (9th Cir. 1980).  In deciding whether such relief is appropriate, courts consider the totality of the circumstances to determine whether there is a reasonable likelihood that the defendant will engage in future violations.  "The existence of past violations may give rise to an inference that there will be future violations; and the fact that the defendant is currently complying with the securities laws does not preclude an injunction." Id. at 655.  Other factors to be considered include

> the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of defendant's professional occupation, that future violations might occur; and the sincerity of his assurances against future violations

Id.

The court has already issued a permanent injunction against Martin and Platforms in connection with the earlier motion for partial summary judgment on § 5 liability.  See Docket No. 75. In that same order, the court found that no permanent injunction should be issued against Draper because the record showed "that Draper was involved in Platforms Wireless in a technical capacity and he confessed to having little understanding of the securities laws. " Id. at 8.  However, with respect to the Rule 10b-5 violations, Draper admitted that his statements were misleading, and he is

responsible for making misleading statements in two of the press releases.  Whereas § 5 imposes strict liability on the sale of unregistered securities absent an exemption, and therefore Draper's unfamiliarity with securities laws might mitigate the need for a permanent injunction with respect to that claim, the court finds that in light Draper's degree of scienter as set forth above, the need for a permanent injunction in light of the Rule 10b-5 violations is more urgent.  In addition, Defendants do not dispute the SEC's contention that Draper "is still in the telecommunications business or is able to return to that business", Mot. at 17, and therefore there is some likelihood that future violations might occur.  Furthermore, there is no evidence of Draper's assurances against future violations or his acknowledgment that his statements were materially misleading.  Therefore, the court issues a permanent injunction against Draper.

As to whether a permanent injunction should issue against Perry, the court notes that it is undisputed that Perry continues to be employed by Platforms.  On the other hand, unlike Draper, Perry is liable, as a matter of law, for only one of the misleading press releases.  Draper has been found to have violated two separate provisions of the securities laws, whereas Perry's liability is confined, at this stage of the case, to one violation of Rule 10b-5.  On the current record, therefore, the court finds that a permanent injunction is not appropriate as to Perry.

**B.     Disgorgement**

The Commission also seeks the remedy of disgorgement.[6]  A district court has broad equity powers to order the disgorgement of "ill-gotten gains" obtained through the violation of the securities laws.  SEC v. First Pacific Bancorp, 142 F.3d 1186, 1191 (9th Cir. 1998).  "Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable."  Id.  Multiple individuals or entities who collaborate or have a close relationship in engaging in the violation can be held jointly and severally liable for disgorgement.  Id.  The amount to be disgorged need only be "a reasonable approximation of profits causally connected to the violation."  Id. at 1192 n.6 (internal quotations omitted).

/ / /

_____

[6] The SEC does not request disgorgement against Draper because the court already ordered such disgorgement in the amount of $402,290 per its January 8, 2007 order.

1    The Commission estimates that Martin should disgorge $701,236, which represents Platforms

2    stock he sold during November-December 2000 as well as amounts transferred to him by an individual

3    named Nadre Davani.  Davani received and sold Platforms shares pursuant to two stock issuance

4    memorandums issued in 2000.  Pl. SOF ¶¶ 22, 32, 37.  Martin contends he never profited from any

5    of the stock sales because "the stock issued by Platforms to me [was] part of my contractual

6    compensation and as a conversion of debt owed to me by the Company[.]"  Martin Decl. ¶ 17.  Martin

7    goes on to assert that in any case, his shares were restricted and therefore unacceptable by brokers for

8    sale.  Id.  However, the evidence shows that Martin did sell his stock despite their restricted status.

9    See Mot., Ex. 38 (bank statements).  Furthermore, the fact that the stock was issued as part of his

10   compensation or as repayment for a debt owed does not change the fact that he personally profited

11   from stock sales.  Accordingly, the court orders that Martin disgorge $701,236.

12   The Commission also requests that Perry be ordered to disgorge $105,657.  Of this amount,

13   Perry contends that $13,942 does not constitute ill-gotten gains because Ralph Smith, who was

14   associated with Benefit Consultants, which is in turn an organization associated with defendant

15   Draper, merely loaned him $13,942 with Perry offering his Platforms shares as collateral.  Perry Decl.

16   ¶ 3.  However, the loan still represents unjust enrichment because the shares permitted Perry to obtain

17   the loan, and Perry has not stated that the loan has been repaid such that the shares are no longer

18   collateralized.  Therefore, no genuine issue of material fact exists as to whether the $13,942 represents

19   Perry's ill-gotten gains.  Accordingly, the court orders that Perry disgorge $105,657.

20   **C.     Penalties**

21   The SEC requests that the court impose civil monetary penalties on Defendants pursuant to

22   the Securities Enforcement Remedies and Penny Stock Reform Act of 1990 (the "Remedies Act").

23   See 15 U.S.C. §§ 77t(d), 78u(d)(3).  In determining whether penalties are appropriate, courts look to

24   the egregiousness of the violation, the defendant's scienter, the repeated nature of the violations,

25   defendant's failure to admit wrongdoing, whether the defendant's conduct created a substantial loss

26   or risk of substantial loss to others, the defendant's lack of cooperation, and the defendant's current

27   and future financial condition.  See SEC v. Lybrand, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003).

28   / / /

The Remedies Act provides a tiered scheme for imposing a penalty.  The first tier is for any violation, the second tier applies to violations that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and the third tier applies to violations that meet the criteria of the second tier and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."   15 U.S.C. §§ 77t(d), 78u(d)(3)(B)(i),(ii),(iii).

In light of the Rule 10b-5 violations here, the court finds that penalties under the second tier are appropriate.  Contrary to the SEC's conclusory argument, there is no evidence that the violations here resulted in substantial losses or created a risk of substantial loss to other persons, and therefore third tier penalties are not appropriate.  Under the second tier, the penalty shall not exceed the greater of (1) $50,000 for a natural person or $250,000 for any other person, or (2) the gross amount of pecuniary gain, for each violation.  § 78u(d)(3)(B)(iii).  In light of the high degree of scienter as to the particular individual defendants and the issuance of multiple materially misleading press releases, the court imposes penalties in the amount of $40,000 for each violation as to Draper and Perry.  Since Draper is responsible for two violations, his penalty is in the amount of $ 80,000; since Perry is responsible for one violation, his penalty is in the amount of $40,000.  The penalty against Martin, who is responsible for two violations, should be lower because he admitted he acted naively and, unlike the other individual defendants, expresses regret for his actions.  Therefore, the court imposes a penalty against Martin in the amount of $20,000 for each violation, making his total penalty $40,000.

**D.     Officer and Director Bars, Penny Stock Bars**

The court "has broad equitable powers to fashion appropriate relief for violations of the federal securities laws, which include the power to order an officer and director bar."  First Pacific Bancorp, 142 F.3d at 1193.  In addition to its inherent equitable powers, the Remedies Act specifically authorizes a court to impose an officer and director bar "if the person's conduct demonstrates substantial unfitness to serve as an officer or director."  15 U.S.C. § 78u(d)(2).  The bar may be imposed conditionally or unconditionally, and permanently or for a period of time to be determined by the court.  Id.  Factors to consider when deciding whether an officer and director bar should be imposed include

1

(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.

2

3

4   First Pacific Bancorp, 142 F.3d at 1193 (citing SEC v. Patel, 61 F.3d 137, 141 (2d Cir. 1995). Before

5   choosing to impose a permanent bar, the Second Circuit advises courts to "consider whether a

6   conditional bar (e.g., a bar limited to a particular industry) and/or a bar limited in time (e.g., a bar of

7   five years) might be sufficient, especially where there is no prior history of unfitness." Patel, 61 F.3d

8   at 142. A general statement that the defendant used his position as an officer or director to engage in

9   misconduct is insufficient justification, on its own, for granting the permanent bar remedy. Id. at 141-

10  42. On the other hand, when the violations have been committed with a high degree of scienter, past

11  securities law violations are present, and a defendant has failed to give assurances against future

12  violations, a court does not abuse its discretion by imposing a permanent bar. SEC v. Posner, 16 F.3d

13  520, 521-22 (2d Cir. 1994).

14          Applying the factors described in First Pacific Bancorp to the instant case, the  court finds

15  that the violations here were egregious because they involved the release of multiple misleading

16  press releases during two calendar years. A high degree of scienter is involved in light of the fact

17  that Platforms did not have an actual ARC System at all relevant times, only drawings and a

18  description, as well as Platforms' obvious lack of resources. No corrections were made to any of

19  the press releases, even after Defendants realized later that some of them were misleading. All of

20  the liable individual defendants were officers of Platforms when they violated Rule 10b-5, and

21  therefore stood in a fiduciary capacity with respect to Platforms and its shareholders. The record

22  shows that only Martin is a repeat offender, having been convicted for a misdemeanor securities

23  violation more than twenty years ago. See Docket No. 47 (Reed Decl. in support of Pl. Mot. for

24  Partial Summary Judgment, Ex. W). Except for Martin, who is a repeat offender, there is no

25  evidence on whether Draper or Perry are likely to violate the securities laws in the future, and

26  therefore this factor is in equipoise. Finally, Martin gained a substantial amount, $701,236, from

27  his violations, with Perry and Draper's stake being less at $105,657 and $402,290 respectively.

28  / / /

1    With these considerations in mind, the court finds that the bar should be imposed more

2  severely on Martin than on Draper, in light of Martin's repeat offender status and Martin's higher

3  economic stake in the fraud.  Draper's bar, in turn, should be more severe that any imposed on

4  Perry, who is liable for one violation as a matter of law, compared with Draper's two violations.

5  In addition, Martin and Draper also violated § 5 as determined by the court on January 8, 2007,

6  whereas Perry has not.  In mitigation, Martin has expressed regret for his reckless conduct.

7  Therefore, the court imposes an eight-year officer and director bar against Martin, a seven-year

8  officer and director bar against Draper, and a four-year officer and director bar against Perry.  For

9  these periods of time,  these three defendants may not act as an officer or director of any issuer as

10  provided for in Title 15, U.S.C. § 78u(d)(2).

11    Finally, as to the SEC's request pursuant to 15 U.S.C. § 78u(d)(6)(A)[7] for penny stock

12  bars, "[w]hen deciding to impose such a bar, the court looks at essentially the same factors that

13  govern the imposition of an officer or director bar."  SEC v. Wolfson, 2006 WL 1214994, *10 (D.

14  Utah 2006) (citing SEC v. Steadman, 603 F.2d 1126, 1140 (5th Cir.), aff'd, 450 U.S. 91 (1981)).

15  Resting on the grounds provided above in connection with the officer and director bars, the court

16  also imposes penny stock bars against Martin for eight years, against Draper for seven years, and

17  against Perry for four years.

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  _____

24    [7] That subpart provides in full,

25    In any proceeding under paragraph (1) against any person participating in, or, at the time of
    the alleged misconduct who was participating in, an offering of penny stock, the court may
26    prohibit that person from participating in an offering of penny stock, conditionally or
    unconditionally, and permanently or for such period of time as the court shall determine.

27

28  15 U.S.C. § 78u(d)(6)(A).

1  **XI.**    **CONCLUSION**

2        For the foregoing reasons, the motion for summary judgment is **GRANTED** with respect to

3  Platforms, Martin, Perry, and Draper.  The motion is, however, **DENIED** with respect to Nelson.

4        **IT IS SO ORDERED.**

5  DATED:  April 25, 2007

6                                                                        _____

7                                                                        Hon. Jeffrey T. Miller
                                                                           United States District Judge

8  cc: All Parties

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28