**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>vs.<br><br>PLATFORMS WIRELESS INTERNATIONAL CORP., et al.,<br><br>    Defendants. | CASE NO. 04 CV 2105 JM (AJB)<br><br>**ORDER PARTIALLY VACATING GRANT OF SUMMARY JUDGMENT AS TO SECTION 10(B) AND RULE 10B-5 CLAIMS** |

In this SEC enforcement action, the court has granted summary judgment on all but one of the SEC's claims. The court partially granted Defendants' motions for reconsideration on January 31, 2008. Pursuant to this order, the court will reconsider the grant of summary judgment on Plaintiff's claims under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. The parties have submitted supplemental briefing applying the correct scienter standard to Defendants' conduct. The court now considers whether to modify its grant of summary judgment against defendants Platforms Wireless, William Martin, Francois Draper, and Robert Perry. For the reasons set forth below, the court hereby **AFFIRMS** the grant of summary judgment against Martin and Platforms based on the August 23, 2000 press release; **VACATES** the grant of summary judgment against Martin and Platforms based on the May 15, 2000 and September 19, 2000 press releases; and **VACATES** the grant of summary judgment against Draper, Perry, and Platforms based on the March 8, 2001 press

release.

## I.     BACKGROUND

The SEC alleges that defendants Platforms Wireless, Martin, Draper, Charles Nelson, and Perry made false and misleading statements to the public to influence the price of Platforms Wireless stock. At the pertinent period of time, Martin, Nelson, Perry, and Draper were alleged officers and/or directors of Platforms Wireless. The complaint asserts violations of § 5 of the Securities Act of 1933, 15 U.S.C. § 77e; § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); and Rule 10b-5 promulgated under § 10(b), 17 C.F.R. § 240.10b-5.[1]

In regard to the Rule 10b-5 claims, the SEC alleges that in 2000-2001, Defendants issued a series of press releases containing false and misleading statements to influence the price of Platforms stock, in violation of Rule 10b-5. Platforms issued these press releases on May 15, 2000, August 23, 2000, September 19, 2000, January 16, 2001, March 5, 2001, and March 8, 2001. The press releases touted Platforms' development of a product called the ARC System, which purportedly offered cost-efficient delivery of wireless communications services. The press releases also projected $1 billion in sales and a $330 million contract between Platforms and a Brazilian company for the purchase of the ARC System. The press releases further provided that Platforms was nearing completion of certain financial audits that would eventually result in Platforms being relisted on the public exchanges.

In a sequence of orders, the court granted summary judgment on all of the SEC's claims against all of the defendants with the exception of the Rule 10b-5 claim against defendant Nelson. (See Doc. nos. 75, 105 ("Rule 10b-5 Order"), 108.) In the Rule 10b-5 Order, the court found liability based on press releases issued on four dates: (1) May 15, 2000 (against Martin, and Draper, and Platforms); (2) August 23, 2000 (against Martin and Platforms); (3) September 19, 2000 (against Martin and Platforms); and (4) March 8, 2001 (against Draper, Perry, and Platforms).

On July 2, 2007, the court further clarified the summary judgment orders in a grant of partial reconsideration. (Doc. no. 112.) Nelson subsequently entered into a stipulated judgment with the

---

[1] For the sake of simplicity, this order will generally use the term "Rule 10b-5 claims" to refer to the claims arising under § 10(b) and Rule 10b-5.

1  SEC (Doc. no. 130), and on July 31, 2007, the court entered a final judgment as to Nelson (Doc. no.
2  131) and as to Platforms, Martin, Perry, and Draper (Doc. no. 128). The court entered an amended
3  final judgment against Platforms, Martin, Perry, and Draper on August 6, 2007. (Doc. no 138.)

4  On July 25, 2007, Platforms, Martin, and Perry collectively moved for reconsideration of the
5  court's summary judgment rulings under Federal Rules of Civil Procedure ("FRCP") 59 and 60. (Doc.
6  no. 125.) They also moved for a stay of the judgment awarding injunctive and monetary relief. (Doc.
7  no. 126.) The court held a hearing on these motions on August 24, 2007. Defendant Draper thereafter
8  filed a motion for reconsideration under FRCP 60 and for a stay under FRCP 62. (See Doc. no. 157
9  ("Draper's Mot. for Recons.").) The SEC filed a timely opposition and Draper a timely reply. The
10 court found this motion appropriate for submission on the briefs. See Civ. L.R. 7.1(d)(1).

11 On January 31, 2008, the court granted reconsideration of the Rule 10b-5 judgment and denied
12 reconsideration of the § 5 judgment. (Doc. no. 166 ("Jan. 31, 2008 Recons. Order").) The court held
13 that its Rule 10b-5 Order had neglected to evaluate scienter in light of the "deliberate recklessness"
14 formulation set forth in In re Silicon Graphics, Inc. Securities Litigation, 183 F.3d 970, 977 (9th Cir.
15 1999). (Jan. 31, 2008 Recons. Order at 5.) The court ordered additional briefing applying the correct
16 scienter standard to Martin and Perry. After completion of the additional briefing, the court would
17 determine whether application of the deliberate recklessness standard requires reversal or modification
18 of any of the Rule 10b-5 rulings. The court granted a stay of all monetary relief until further notice,
19 and declined to rule on the request for a stay of injunctive relief until after the ruling on the
20 supplemental briefing.

21 The court also vacated the grant of summary judgment against Draper based on the May 15,
22 2000 press release, in light of the SEC's concession that Draper should not be liable for this press
23 release since he did not join Platforms until June 2000. (Recons. Order at 6.) Accordingly, the court
24 reduced the civil penalty against Draper from $80,000 (based on two press releases) to $40,000 (based
25 on one press release), without prejudice to a determination that Draper should not bear liability for the
26 March 8, 2001 press release. (Id.)

27 Pursuant to the order granting partial reconsideration, the parties submitted supplemental
28

briefing applying the Silicon Graphics scienter standard to Martin and Perry.[2] The court determined that the briefing on Draper's separate motion for reconsideration made further briefing regarding Draper unnecessary.

## II.   DISCUSSION

### A.   Legal Standards

A motion for summary judgment shall be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FRCP 56(c); British Airways Bd. v. Boeing Co., 585 F.2d 946, 951 (9th Cir. 1978), cert. denied, 440 U.S. 981 (1979). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the file which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Rule 56 contains "no express or implied requirement . . . that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Id. The opposing party cannot rest on the mere allegations or denials of a pleading, but must "go beyond the pleadings and by [the party's] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (citation omitted). The opposing party also may not rely solely on conclusory allegations unsupported by factual data. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

The court must examine the evidence in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Any doubt as to the existence of any issue of material fact requires denial of the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). On a motion for summary judgment, when "'the moving party bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence were uncontroverted at trial.'" Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992) (quoting

---

[2] Defendants submitted a supplemental declaration from Martin and 25 exhibits in support of their supplemental brief. This violates the court's clear order that the supplemental briefing "shall be limited to the evidence that was before the court during the initial Rule 10b-5 summary judgment proceedings." (Jan. 31, 2008 Recons. Order at 15-16.)  The court will not consider evidence not originally before it. Likewise, the court will not consider evidence presented in Defendants' motions for reconsideration which was not originally before the court.

International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir. 1991), cert. denied, 502 U.S. 1059 (1992)).

**B.    Analysis**

**1.    Rule 10b-5**

Section 10(b) of the Securities Exchange Act makes it unlawful

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 in turn makes it unlawful for

> any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, . . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To establish a prima facie case under § 10(b), the SEC must show that Defendants made a misstatement or omission of a material fact with scienter. See SEC v. Fehn, 97 F.3d 1276, 1289 (9th Cir. 1996). A fact is material if "there is a reasonable likelihood that a reasonable shareholder would consider it important" in making an investment decision. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); Zweig v. Hearst Corp., 595 F.2d 1261, 1266 (9th Cir. 1979). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). The scienter of a corporation can be imputed from that of its officers. SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

In the § 10(b) context, scienter requires "proof that the defendant acted knowingly or recklessly." Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th Cir. 1990) (en banc). Hollinger defined recklessness as "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. at 1569. The Ninth Circuit explained this standard in

1  Silicon Graphics. The Silicon Graphics court held that "deliberate recklessness" is the requisite state
2  of mind for a § 10(b) violation. 183 F.3d at 977. "[R]ecklessness only satisfies scienter under § 10(b)
3  to the extent that it reflects some degree of intentional or conscious misconduct." Id. Thus, as this
4  court explained in the January 31, 2008 order partially granting reconsideration, Silicon Graphics
5  clarified Hollinger in an important way: Silicon Graphics made clear that recklessness, as defined in
6  Hollinger, has a subjective component. (Jan. 31, 2008 Recons. Order at 5.) Ninth Circuit case law
7  following Silicon Graphics confirms this interpretation. See, e.g., SEC v. Rubera, 350 F.3d 1084,
8  1094-96 (9th Cir. 2003) (citing both Hollinger and Silicon Graphics in affirming district court's
9  finding that defendant lacked intent or recklessness); Ponce v. SEC, 345 F.3d 722, 731 (9th Cir. 2003)
10 (citing only Hollinger but employing largely subjective analysis); Ronconi v. Larkin, 253 F.3d 423,
11 430 (9th Cir. 2001) (applying Silicon Graphics' "deliberate recklessness" standard). Accordingly,
12 even if "deliberate recklessness" is not a higher standard but merely a clarification of or gloss on
13 Hollinger, it still emphasizes the requirement of "some degree of intentional or conscious
14 misconduct." Silicon Graphics, 183 F.3d at 977.[3]

### 2.    May 15, 2000 Press Release (Martin, Platforms)

*Falsity and Materiality.*[4] In the May 15, 2000 press release, Platforms announced "that two years of intensive marketing efforts in Brazil have culminated in a landmark, $330 million contract award from AMERICEL S.A. . . . one of the leading cellular communications service providers in Brazil[.]" (Rule 10b-5 Mot. for Summ. J. ("Rule 10b-5 MSJ"), Exh. 13.) The release further provided that the contract was "conditional on the performance by Platforms of a successful ARC System BETA Demonstration in Brazil in the 4th Quarter of 2000, [and] is for a ten-year lease of up to five (5) ARC Systems." (Id.) As the SEC pointed out, however, the contract between Platforms and Americel was not valued at $330 million but rather for an undetermined price to be negotiated in the

---

[3] The SEC reiterates its argument that Silicon Graphics should be limited to private actions at the pleading stage and does not alter the standard expressed in Hollinger. (See Pl.'s Supp. Br. at 2 n.2.) The court ruled on this issue in the order granting reconsideration and will not reconsider the issue again in this order.

[4] The court's January 31, 2008 order did not order briefing regarding the falsity and materiality of the statements made in each press release. Thus, the court will not consider the parties' numerous arguments directed to falsity and materiality. Except where indicated otherwise, the court will reference the falsity and materiality findings only to provide context for the scienter analysis.

future based on Americel's "Favored Nation" status. (Rule 10b-5 MSJ, Exh. 15 (copy of contract) at Art. 3.)

In the Rule10b-5 Order, the court held that this was an untrue statement of material fact. (Rule 10b-5 Order at 4-5.) In light of the contract language, the statement that the contract between Platforms and Americel was valued at $330 million was false when made, and Defendants failed to come forth with any evidence creating a genuine issue of fact to the contrary. (Id. at 4.) The statement was also material because a reasonable investor would want to know, before making an investment decision, that the contract price was not $330 million but was actually to be negotiated. (Id. at 5.)

***Scienter.*** Defendant Martin was Platforms' Chief Executive Officer. (Doc. no. 93 (Martin Decl.) at ¶ 2.) The May 15, 2000 press release quoted Martin as stating, "The award of this [$330 million] contract by AMERICEL, one of the leading cellular communications service providers in Brazil, is a resounding validation of our airborne wireless communications technology in one of the most competitive telecommunications markets in the world." (Rule 10b-5 MSJ, Exh. 13.) In the Rule 10b-5 Order, the court found that Martin was reckless as a matter of law in light of the contract's express provision that the contract price was to be negotiated.

The SEC argues that Martin possessed the requisite scienter under the "deliberate recklessness" standard because he actually knew that the statements in the press release were false. (Pl.'s Supp. Br. at 6-11.)[5] Martin testified that he knew the value of the contract was "[p]ossibly 50 percent of" the $330 million stated value. (Rule 10b-5 MSJ, Exh. 8 at 249.[6]) The SEC also notes that

---

[5] Many of the arguments raised by both sides relate to the press release's failure to mention that Americel had the right to cancel the contract. For instance, the SEC cites Martin's statement that, "if [Americel] wanted to get out, they could get out." (Pl.'s Supp. Br. at 10 (quoting Rule 10b-5 MSJ, Exh. 8 (Martin Depo.) at 246).) Defendants argue that Platforms and Martin "had reason to believe that the cancellation provisions in the contract were not operative." (Defs.' Supp. Oppo. at 6.) In the Rule 10b-5 Order, however, the court determined that the omission of Americel's right to cancel was not material as a matter of law. Citing Draper's testimony that "it was [the] clear understanding that if [Platforms] met the requirements of the contract, [Americel] had the commitment to proceed" (Doc. no. 92 at 70), the court held that a jury could only conclude that the cancellation provision was not operative. (Rule 10b-5 Order at 5.) The central issue in regard to the May 15, 2000 press release is whether Martin was deliberately reckless in stating that the contract was valued at $330 million.

[6] All page citations to exhibits with pagination in the original, such as depositions, will refer to the original pagination.

1 Draper acknowledged, in a July 7, 2000 email, that the press release "did not reflect the reality of the
2 contract . . . The inuendos created by NOT releasing the 'truth' in the PR were incredible." (Rule 10b-
3 5 MSJ, Exh. 16 at 4-5.)

4       Defendants contend that Martin estimated the value of the contract using an acceptable
5 accounting method. (Defs.' Supp. Oppo. at 6.) They cite Article Eight, which provides that, if the
6 live test in Brazil succeeded, Americel "shall proceed" to leave up to five ARC systems at a ten-year
7 lease price of $12 million plus $500,000 in monthly maintenance and operations fees and an eight
8 percent share of gross revenues. (See Rule 10b-5 Order, Exh. 15 at Art. 8.) They claim that this
9 shows Martin's $330 million estimate was actually conservative. In response, the SEC emphasizes
10 that the critical issue is not Martin's cost-accounting accuracy but his awareness "that the numbers
11 in [the press release] were overstated." (Pl.'s Supp. Reply at 3.)

12       The court agrees that the inquiry focuses on whether Martin knew that the contract value was
13 $330 million but an undetermined price to be negotiated in the future based on Americel's "Favored
14 Nation" status. Regardless of whether he arrived at $330 million by discounting one possible value
15 of the contract, he knew the contract value could ultimately be half of $330 million. (See Rule 10b-5
16 MSJ, Exh. 8 at 249.) The SEC has not, however, presented evidence showing that Martin understood
17 the contract value was to be negotiated pursuant to Article Three and Americel's "Favored Nation"
18 position. Contrary to the SEC's contention, Martin's testimony also supports the reasonable inference
19 that he believed the contract value could change if the new Aerostat technology proved successful.
20 (See id.) Martin testified that this possibility was not written in the contract. (See id.) The court
21 therefore finds that a genuine issue of material fact exists regarding whether Martin possessed the
22 requisite scienter. (See also Doc. 97 (Martin depo.) at 267 ("In 2000, 2001 . . . we had not learned the
23 lessons that we've learned by now, which is people are sometimes quite easy to give you a contract
24 on paper because at the end of the day, that contract doesn't mean a damn thing to them. And not only
25 that, after they give you the contract, now they say to you now it's time to start negotiating.").)

26       Events surrounding the approval of the press release also demonstrate the existence of a
27 genuine issue of material fact. Both parties cite the fact that Adalberto Vianna, Americel's president,
28 and Victor Ziller, Platforms' Brazilian representative, approved the press release prior to issuance.

1 Martin testified that "[e]verything was done according to the way [Vianna] wanted the press release
2 worded and done," with the exception of one last-minute change requested by Vianna. (Rule 10b-5
3 MSJ, Exh. 47 at 141.) In his deposition, Martin stated that Platforms issued the press release without
4 the change because the modification was "one or two words in one sentence and it wasn't a big deal."
5 (Id. at 142.) In an email from Martin to Draper, sent in response to a July 7, 2000 email from Draper,
6 Martin wrote,

> The only item which was not addressed was a last minute modification by Adalberto
> Viana, re: his suggestion of an additional caveat on the conditional nature of the
> contract; i.e., the addition of a sentence to the effect that there were also 'financing and
> acceptable economic conditions' involved in the Americel conditional consideration.

10 (Rule 10b-5 MSJ, Exh. 16 at 3.) The SEC argues that this supports the inference that Martin
11 deliberately chose not to clarify that the contract price was subject to negotiation. According to
12 Defendants, however, this supports the inference that Martin believed the press release sufficiently
13 conveyed the conditional nature of the contract. (See Defs.' Supp. Oppo. at 8.) Defendants claim that
14 the "conditional language" in the press release further supports their position. (See id. at 7.) Based
15 on this evidence, the court finds that a jury could reasonably infer that Martin did not act with
16 deliberate recklessness in issuing this press release.

17 The court also notes that the SEC presents evidence suggesting a financial motive to boost the
18 market price and demand for Platforms stock. The SEC draws attention to a May 11, 2000 agreement
19 entered into between Platforms and the DRTV Unit Investment Trust ("DRTV"). (See Doc. no. 91
20 (Pl.'s Statement of Uncontested Material Facts in Supp. of Rule 10b-5 MSJ) at 14.) Pursuant to this
21 agreement, DRTV would pay Platforms $250,000 for each one million shares and warrants issued to
22 DRTV investors. (Id.) DRTV had the contractual right to purchase up to three $250,000 blocks of
23 Platforms securities. (Id.) A $250,000 check drawn on DRTV's account was deposited in Platforms'
24 checking account on May 17, 2000, at approximately the same time as Intermedia received a $200,343
25 check signed by Nelson. In previous orders, the court has found that Martin controlled Intermedia.
26 The SEC now argues that Platforms and Martin had an interest in promoting Platforms stock because
27 retaining DRTV's interest in buying and reselling the shares would allow Martin to "funnel the funds
28 through Intermedia," to the benefit of all defendants. (Pl.'s Supp. Reply at 4; see also Pl.'s Supp. Br.

1  at 8-9 (citing Doc. no. 90, Exh. 3 at 137-38, in which Martin testified that a press release could make
2  Platforms stock "go boom," referring to a later contract for business in Indonesia).) Defendants
3  respond that the record reveals no insider trading (Defs.' Supp. Oppo. at 8-9 (citing Ronconi, 253 F.
4  3d at 435)), and that the DRTV transactions, for various reasons, were not illicit. Whether or not the
5  DRTV deals demonstrated an improper motive, a material dispute regarding Martin's state of mind
6  exists. Therefore, the task of construing the DRTV deals is best left to a jury.

7  Accordingly, the court vacates the grant of summary judgment against Martin and Platforms
8  based on the May 15, 2000 press release.

### 3. August 23, 2000 Press Release (Martin, Platforms)

*Falsity and Materiality.* In this press release, Platforms announced "its new family of Airborne 'Zerogravity AeroStructures'" which offers "a superior, proven, more stable, and far more efficient and cost-effective Airborne infrastructure platform than fixed-wing aircraft." (Rule 10b-5 MSJ, Exh. 23 at 1.) The press release described the product as "a large, unmanned, helium-filled, aerodynamically-shaped airship structure that can be stationed at an altitude of up to 25,000 feet." (Id.) The press release attributed the following quotation to Martin: "We are pleased to announce negotiations and program logistics for the implementation and deployment of our new family of airborne wireless communications infrastructures have been completed." (Id. at 1-2.)

In the Rule 10b-5 Order, the court held that the press release was materially misleading as a matter of law. The press release permitted only the conclusion that Platforms was announcing it had actually developed a viable ARC System. (Rule 10b-5 Order at 7.) The press release was nine pages long, in relatively small type, and single-spaced. It described the physical characteristics and functionality of the system in great detail, taking up the first two pages and the last three and a half pages. This detailed announcement was misleading since Platforms had only drawings and descriptions of the system and no funds to purchase the requisite airship. Defendants did not come forth with any evidence allowing a jury to find otherwise.

*Scienter.* Martin admitted that, at the time of the press release, no actual ARC System existed. Platforms had only a description of the system. (Rule 10b-5 MSJ, Exh. 3 at 224.) In the Rule 10b-5 Order, the court concluded that Martin acted with scienter because he knew or was reckless in not

knowing that the press release would give the false impression that the ARC System was ready for market. (Rule 10b-5 Order at 8.)

The SEC argues that Martin acted with deliberate recklessness. In its supplemental brief, the SEC relies largely on the evidence cited by the court in the Rule 10b-5 Order. The SEC also argues that Martin knew Platforms did not have the funds to make an ARC System, since Platforms had $16,530 at the end of August 2000, and an airship cost $50,000. (Pl.'s Supp. Br. at 11 (citing Rule 10b-5 MSJ, Exhs. 24, 3 at 285-86).)

This evidence compels the same conclusion the court reached in the Rule 10b-5 Order. Martin knew that Platforms had only a "description and definition of how the system would operate." (Rule 10b-5 MSJ, Exh. 3 at 224.) This knowledge satisfies <u>Silicon Graphics</u>' deliberate recklessness standard by showing that Martin acted either intentionally or with awareness of his misconduct when he issued the statement giving the impression that Platforms had a viable ARC System.

Defendants fail to cite evidence contradicting this conclusion. Their main argument is that Martin's statement was "inartful but aimed to create a true and appropriate message about Platforms' products." (Defs.' Supp. Oppo. at 11.) Defendants parse the words of the press release in arguing that Martin's statement actually conveyed that development of the product was ongoing, which they claim was not technically incorrect. As the court has already held, however, the press release gives the false impression that the new system was ready for market. Martin knew that the system was not yet viable. His alleged "good marketing reasons to make the announcement in order to try to stimulate business" and "drum up the needed customers" do not demonstrate "a good-faith basis for putting out the release announcing products, even if the orders did not come and there would be challenges filling them." (<u>Id.</u>) To the contrary, this argument shows his motive for issuing the misleading press release.

Accordingly, the court affirms its grant of summary judgment against Martin and Platforms based on the August 23, 2000 press release.

### 4. September 19, 2000 (Martin, Platforms)

*Falsity and Materiality.* This press release announced, in a statement attributed to Martin,

> We are pleased to report that significant business activity in Latin America and The Pacific Rim has prompted the revision of our Company's anticipated business goals, raising our sales and marketing projections to $1 billion in ARC System contracts by the end of FYE June 30, 2001.

(Rule 10b-5 MSJ, Exh. 33 at 5-6.)

In the Rule 10b-5 Order, the court held that this statement was materially false as a matter of law. (Rule 10b-5 Order at 8-9.) Martin admitted in his deposition that the $1 billion sales projection was "a naive statement" issued "to my own chagrin and regret, because I believed what people were telling me at the time I was simply not experienced enough to discern what was credible or not." (Rule 10b-5 MSJ, Exh. 8 at 292.) In light of this admission, the court found the forecast materially false as a matter of law because it was made with neither reasonable preparation nor a valid basis. (Rule 10b-5 Order at 9 (citing Marx v. Computer Sciences Corp., 507 F.2d 485, 490 (9th Cir. 1974)).) The statement was material because the viability of Platforms' opportunity to realize $1 billion in revenue would be important to a reasonable investor's decision to invest. (Rule 10b-5 Order at 8.)

Upon further review of this press release, the court vacates its finding that this statement was materially false as a matter of law. The court originally construed the statement as announcing that Platforms "would reach" $1 billion in ARC System contracts. (Rule 10b-5 Order at 8.) This interpretation did not take into full account the qualifying language in the statement. For instance, the statement's references to "anticipated business goals" and "sales and marketing projections" suggest a less absolute forecast than the court originally contemplated. Thus, a genuine issue of material fact exists as to whether this statement is materially false or misleading.

*Scienter.* Martin's declaration provided that his forecast was based on certain negotiations with countries in Asia, and that the $1 billion projections was overly optimistic. (Doc. no. 93 (Martin Decl.) at ¶ 19.) The declaration provided,

> Now, after years of working with the emerging and developing nations of the world, I realize just how inexperienced and naive I was about the nature and pitfalls of third world business and contractual representations. The marketing projection in question, albeit made in good faith and inexperienced belief in the international market opportunities before the Company at the time, was my mistake and I regret having made it. A lesson well learned.

(Id.) The court found that this constituted an admission of recklessness and established that Martin acted with scienter. The court held that Martin's admission permitted only the conclusion that his conduct was an extreme departure from the ordinary standard of care. (Rule 10b-5 Order at 10.) "Additionally, the danger of misleading investors, who would likely give credence to a company-

issued $1 billion forecast, should have been obvious to Martin, the CEO of a publicly-traded company." (Id.) The court concluded, "Martin's good-faith belief is not enough to create a genuine issue of fact as to whether he was reckless, since recklessness is judged by an objective standard." (Id.)

In light of the holding that a genuine issue of material fact exists as to whether Martin's statement was materially false, the court need not address whether Martin possessed the requisite scienter. The court notes, however, that even if no genuine issue of material fact regarding falsity and materiality existed, a genuine issue of material fact remains regarding whether Martin's statement was deliberately reckless.

The SEC claims that Martin knew the statement was false, or at a minimum acted with deliberate recklessness, because he knew Platforms had only the description and definition of how the ARC system would operate, and Platforms "could not make serious strides in design or manufacture given that the company had only $28,046 in its bank account on September 29, 2000 and no actual contracts for sale." (Pl.'s Supp. Br. at 12.) The SEC also argues that Martin acted recklessly because his statement was "grossly exaggerated (in fact, totally false)" and "based on unsubstantiated rumor from one or more remote sales people which he deliberately did not confirm, despite the preposterous nature of the claims." (Id. at 13.) Finally, the SEC claims that Martin had a financial motive to defraud since Defendants admitted they relied on stock sales for income, and since $244,024 was deposited in Intermedia's bank account on September 26, 2000. (See Doc. no. 91 at 12; Rule 10b-5 MSJ, Exh. 31.)

In the Rule 10b-5 Order, the court relied on an objective recklessness standard in holding that Martin departed from the ordinary standard of care. Under Silicon Graphics' subjective analysis, however, Martin's admission that he was "naive" and "believed what people were telling [him] at the time" do not rise to the level of deliberate recklessness. (See Rule 10b-5 MSJ, Exh. 8 at 292.) A good-faith belief in the veracity of an ultimately false statement does not constitute "intentional or conscious misconduct." Silicon Graphics, 183 F.3d at 977. The statement's anticipatory and qualifying language also supports the reasonable inference that Martin did not act with deliberate recklessness toward the misleading nature of his statement. Based on this evidence – as construed in

1  the light most favorable to Defendants – a jury could reasonably find that Martin did not possess the
2  requisite scienter. The SEC's comment that "Martin's credibility about sales prospects should be
3  deemed to be approximately zero" (Pl.'s Supp. Br. at 13) further underscores the existence of a
4  genuine factual dispute.[7]

5  The court therefore vacates the grant of summary judgment against Martin and Platforms based
6  on the September 19, 2000 press release.

7  **5.   March 8, 2001 Press Release (Draper, Perry, Platforms)**

8  *Falsity and Materiality.* This press release discussed the March 5, 2001 ARC System
9  demonstration in San Diego. (Rule 10b-5 MSJ, Exh. 46.) Entitled "Innovative Wireless
10 Communications Technology Successfully Demonstrated," the release included the following
11 quotation attributed to Draper: "The system you see here . . . is the same ARC System we're shipping
12 to Brazil for commercial installation and demonstration this Spring. This System is ready to go into
13 commercial service in the state of Goias[.]" (Id. at 3.) The press release also attributed the following
14 quotation to Perry: "The ARC System's airborne wireless communications capabilities are fully
15 operational and ready for commercial delivery." (Id. at 3.)

16 The court found both statements materially false. First, the court found that Draper's statement
17 regarding the ARC System's shipment to Brazil "for commercial installation and demonstration" was
18 false and misleading as a matter of law because the evidence supports only the conclusion that, at the
19 time, the system was disassembled in storage and therefore could not have been imminently shipped.
20 (Rule 10b-5 Order at 14.) Draper testified that, although the system was disassembled, "we probably
21 would have shipped it that way. We had discussed that how will we get it to Brazil because it was just
22 way too cumbersome." (Rule 10b-5 MSJ, Exh. 7 at 243; see also id., Exh. 54 at SEC V PLFM-
23 00012066 (May 21, 2001 email from Wayne Chancellor to Draper, providing, "We are storing the
24 hardware in a disassembled state until the current contractual issues are resolved and we have a better

---

[7]The SEC responds that, even if Martin did not act with deliberate recklessness when he made the statement, he violated § 10(b) and Rule 10b-5 by failing to correct the statement once he realized it was misleading. (Pl.'s Supp. Br. at 13 n.8 ("Summary judgment as to this press release is appropriate [because] they left the fraud in place.").) Because the SEC mentioned this argument only in a footnote in the original motion for summary judgment, and because the court did not use the argument as a basis for the original ruling, the court declines to rely on the argument in this order. This does not preclude the SEC from re-addressing the argument should the case proceed to trial.

understanding of what the future holds").)

Construing the evidence in the light most favorable to Defendants, the court held that Draper's testimony would permit the reasonable conclusion that the ARC System was ready to be shipped to Brazil despite its disassembled state. Nevertheless, the court found the March 8, 2001 press release misleading to the extent that the release gave the impression that shipment to Brazil was underway and imminent. (Rule 10b-5 Order at 14.) Draper admitted that, as of May 21, 2001, negotiations were still ongoing and yet Defendants issued no correction. (Rule 10b-5 MSJ, Exh. 7 at 236.) Finally, the court found the statement material because the statement gave the impression that business with Americel was moving in a positive direction, which if true would be important to a reasonable investor's decision to buy or sell Platforms stock.

Upon reconsideration, the court now vacates the finding that Draper's statement was materially false. While Draper's testimony indicates that the ARC System had not been shipped as of May 21, 2001, this does not establish beyond reasonable inference to the contrary that the statement suggesting imminent shipment was false or misleading on March 8, 2001.[8]

In the original order, the court also found Perry's statement that the system was "fully operational and ready for commercial delivery" materially false as a matter of law, based on Ziller's testimony that no completed airship existed. (Rule 10b-5 MSJ, Exh. 5 at 154.) Without the airship, a system described as capable of delivering wireless communications services while floating above ground is neither "fully operational" nor "ready for commercial delivery." The court now affirms the finding of material falsity in regard to the statement that the system was "fully operational."

*Scienter.* Due to the undisputed absence of an airship, the court found Draper's and Perry's statements reckless as a matter of law.

In light of the holding that a genuine issue of material fact exists as to whether the first sentence of Draper's statement was materially false, the court need not address whether Draper

---

[8]Draper's statement in the March 8, 2001 press release also included a second sentence: "This System is ready to go into commercial service in the state of Goias[.]" (Rule 10b-5 MSJ, Exh. 46 at 3.) This sentence did not serve as a basis for the court's original summary judgment ruling. Accordingly, reliance on this second sentence to support or deny summary judgment at this stage in the proceedings would be inappropriate. In so holding, the court expresses no opinion as to whether this second sentence is actionable.

1  possessed the requisite scienter. The court notes, however, that even if no genuine dispute existed
2  regarding falsity and materiality, a genuine issue of material fact remains regarding whether Draper's
3  statement was deliberately reckless.

4        The SEC argues that Draper possessed the requisite scienter under the "deliberate
5  recklessness" standard because Draper knew that Platforms lacked a delivery system. The SEC cites
6  Draper's testimony indicating that Draper knew the Brazil demonstration required a balloon, tether,
7  and mooring platform. (See Doc. no. 92, 133-34.) Draper also testified that, as of January 8, 2001,
8  he believed the Aerostat vendor had not yet ordered the materials for the Aerostat. (See id. at 164.)
9  At that time, he believed that it would take three to four months from the ordering of materials to build
10 the Aerostat, and four to five months from the ordering of materials for the Aerostat to arrive in Brazil.
11 (See id. at 165-66.) The SEC also claims that Draper knew that Platforms could not afford the testing
12 of the balloon, tether, and mooring combination under true commercial conditions. (See Pl.'s Oppo.
13 to Draper's Mot. for Recons. at 8.) Thus, the SEC argues, Draper knew on March 8, 2001 that the
14 ARC System was fully operational.

15       The SEC focuses mainly on the argument that Draper knew the system was not fully
16 operational and ready for commercial delivery. This argument ignores the fact that the court originally
17 found Draper liable based on the first sentence, regarding the "ARC System we're shipping to Brazil
18 . . . ." Draper cites his testimony demonstrating his belief that this statement referred to the payload,
19 not the entire end product. (See Doc. no. 92 at 201-03.) He testified, "when we really refer to the
20 ARC System, we are talking about the payload." (Id. at 203.) Draper also testified that he was not
21 concerned with the Aerostat or the mooring. (Id. at 201.) Furthermore, the SEC does not cite
22 evidence demonstrating that Draper knew on March 8, 2001 that shipment of the ARC System to
23 Brazil was not underway and imminent. Viewed in the light most favorable to Draper, the May 21,
24 2001 email indicating that the payload still had not been shipped to Brazil does not demonstrate
25 Draper's state of mind on March 8, 2001. Thus, a reasonable factfinder could conclude that Draper
26 did not make his statement in the March 8, 2001 press release with the requisite scienter. The court
27 therefore finds that a genuine issue of material fact exists as to whether Draper's statement was
28 deliberately reckless.

The SEC also argues that Perry satisfied the "deliberate recklessness" standard because Perry knew the statement that "the ARC System's airborne wireless communications are fully operational and ready for commercial delivery" (Rule 10b-5 MSJ, Exh. 5 at 154) was false. The SEC cites the evidence that Platforms had only an antenna or payload at the time of the statement (see Rule 10b-5 MSJ, Exh. 7 at 198, Exh. 5 at 154); the San Diego demonstration components were stored "in a disassembled state" (Id., Exh. 54 at 17, Exh. 7 at 236); and, according to Nelson, Perry and others knew that Platforms could not afford to transport the aerostat or payload to Brazil (id., Exh. 4 (Nelson Depo.) at 491). (Pl.'s Supp. Br. at 14.) As the president of "a very small company," the SEC claims, Perry knew that the statement was false or was deliberately reckless in failing to investigate before making his statement.

The court finds that a genuine issue of material fact exists as to whether Perry's statement was deliberately reckless. First, Perry testified that he did not remember reviewing the press release, did not approve the press release, and was not familiar with the statement attributed to him. (Doc. no. 95 (Perry depo.) at 185, 189-90.) The SEC responds with evidence that press releases were distributed to all Platforms officers (Rule 10b-5 MSJ, Exh. 4 at 176), that Perry admitted he had "made statements like this" (Doc. no. 95 at 185-86), and that Perry did not seek to correct the press release. This evidence highlights the existence of a genuine issue of material fact regarding Perry's state of mind. Furthermore, Perry's testimony suggests that, based on conversations with Draper, he believed the ARC System's capabilities had been successfully demonstrated and Platforms was "ready to go to getting the aerostat ready to deliver." (Doc. no. 95 at 188-89.) From Perry's knowledge "of the payload," he testified that he believed the statement was accurate. (Id. at 189-90.) Thus, even if Perry were responsible for a statement he does not recall making, his testimony contradicts the argument that he knew his statement was false or was intentionally reckless in not discovering its falsity. Based on this evidence, summary judgment against Perry is not warranted.

The court therefore vacates the grant of summary judgment against Draper, Perry, and Platforms based on the March 8, 2001 press release.

### 6. Modification of Relief Granted in Conjunction with § 10(b) and Rule 10b-5 Violations

*Martin.* The court previously ordered disgorgement of $701,236 from Martin. District courts possess broad equity powers to order disgorgement of "ill-gotten gains" obtained through violation of securities laws. SEC v. First Pacific Bancorp, 142 F.3d 1186, 1191 (9th Cir. 1998) (citations omitted). "Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." Id. The amount disgorged need be only "a reasonable approximation of profits causally connected to the violation." Id. at 1192 n.6 (internal quotation omitted). In the rule 10b-5 Order, the amount disgorged represented Martin's cumulative profits received between May 2000 and April 2001, including through transactions related to the DRTV agreement. (See also Doc. 91 (Pl.'s Statement of Uncontested Material Facts in Supp. of Rule 10b-5 MSJ) at ¶¶ 22, 27, 32, 37.) Because Martin now bears liability for only the August 23, 2000 press release, the court holds that the causal connection between the profits and Martin's violation is too speculative to support disgorgement. Accordingly, the court vacates the order of disgorgement against Martin.

The court also assessed at $40,000 penalty against Martin in the Rule 10b-5 Order. This $40,000 was based on the conclusion that Martin was responsible for two violations; in fact, Martin was originally responsible for three violations. Regardless, the court determined that Martin should be assessed $20,000 per violation. Because the court now finds Martin liable for only one violation, the $40,000 penalty is reduced to $20,000.

The court also previously granted a permanent injunction (Doc. no. 112) and an eight-year officer and director and penny-stock bar against Martin. In light of the grant of summary judgment against Martin based on the August 23, 2000 press release and for the reasons set forth in the court's earlier orders, the court holds that the permanent injunction and eight-year officer and director and penny-stock bars are still appropriate.

*Draper.* The court previously assessed an $80,000 penalty against Draper, based on Draper's two violations. The court reduced this penalty to $40,000 in the January 31, 2008 reconsideration order. The court also previously granted a permanent injunction and a seven-year officer and director and penny-stock bar against Draper. Because the grant of summary judgment against Draper has been reversed, the court accordingly vacates the remaining $40,000 penalty and all injunctive relief granted

against Draper in conjunction with § 10(b) and Rule 10b-5.

*Perry.* The court previously ordered disgorgement of $105,657 from Perry. The court also assessed a $40,000 penalty against Perry, based on Perry's one violation. The court additionally granted a four-year officer and director and penny-stock bar against Perry. Because the grant of summary judgment against Perry has been reversed, the court accordingly vacates the order of disgorgement, the $40,000 penalty, and all injunctive relief granted against Perry in conjunction with § 10(b) and Rule 10b-5.

*Platforms.* The court previously granted a permanent injunction against Platforms. (Doc. no. 112.) Because the court now finds Platforms liable for one violation arising out of the August 23, 2000 press release, the permanent injunction against Platforms is not lifted.

## III.  CONCLUSION

In sum, the court hereby **AFFIRMS** its grant of summary judgment against Martin and Platforms based on the August 23, 2000 press release; **VACATES** the grant of summary judgment against Martin and Platforms based on the May 15, 2000 and September 19, 2000 press releases; and **VACATES** the grant of summary judgment against Draper, Perry, and Platforms based on the March 8, 2001 press release.

**IT IS SO ORDERED.**

**DATED:  April 3, 2008**

**Hon. Jeffrey T. Miller**
**United States District Judge**